bIN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

FREDERICK A. NORRIS                                                                          PLAINTIFF
ADC # 095167

v.                                          4:23CV00026-BRW-JTK

CHARLES FREYDER, et al.                                                                  DEFENDANTS

# PROPOSED FINDINGS AND RECOMMENDATIONS

# INSTRUCTIONS

The following recommended disposition ("Recommendation") has been sent to United States District Judge Billy Roy Wilson. Any party may file written objections to all or part of this Recommendation. If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objections; and (2) be received by the Clerk of this Court within fourteen (14) days of this Recommendation. By not objecting, you may waive the right to appeal questions of fact.

# DISPOSITION

## I.  Introduction

Frederick A. Norris ("Plaintiff") is in custody at the Randall Williams Unit of the Arkansas Division of Correction ("ADC"). On January 9, 2023, Plaintiff sued Chaplain Charles Freyder[1] in his personal and official capacities alleging violations of his Plaintiff's First Amendment rights. (Doc. No. 2).

---

[1] Plaintiff also sued Defendants Owney, Lee, Joe Page, and Dale Reed, but those claims have already been dismissed. (Doc. Nos. 3, 9, 51, 57). Only Plaintiff's First Amendment claims against Defendant Freyder remain pending.

On September 7, 2023, Plaintiff filed a Motion for Summary Judgment and Statement of Undisputed Material Facts. (Doc. Nos. 68, 69). Defendant Freyder responded to Plaintiff's Motion (Doc. Nos. 75, 76) and filed a competing Motion for Summary Judgment, together with a Brief in Support and Statement of Undisputed Facts. (Doc. Nos. 72, 73, and 74). Plaintiff has not responded to Defendant Freyder's Motion and the time for doing so has passed.

After careful consideration and for the reasons set out below, the Court recommends Defendant Freyder's Motion (Doc. No. 72) be granted, Plaintiff's Motion (Doc. No. 68) be denied, and Plaintiff's claims against Defendant Freyder be dismissed with prejudice.

## II. Plaintiff's Claims

Plaintiff complains that Defendant Freyder does not allow inmates, including Plaintiff, to act as prayer leaders or temporary prayer leaders and deliver the Khutbah during Jumu'ah[2] prayer service. (Doc. No. 2 at 23, among others). Plaintiff maintains this prohibition violates his right to freely exercise his religion and his right to free speech. (Id.). Plaintiff also complains that Defendant Freyder requires inmates to "write a request changing their religious faith and belief to be allowed to attend Jumn'ah as visitor" where there is no similar requirement for other religious services. (Id. at 15). Further, Plaintiff complains that Defendant Freyder keeps a list of inmates approved for Jumu'ah prayer and if an inmate misses "too many days" of Jumu'ah, Defendant Freyder "will block the inmate" from attending Jumu'ah, which happened to Plaintiff on November 23, 2023. (Id. at 9). Plaintiff seeks damages and injunctive relief. (Id. at 14-22).

---

[2] "A jum'ah service is held on Fridays and has an Imam lead those assembled in a formal sermon called the Khutbah and is followed by the prayers." Sheldon v. Carr, No. C00-0024, 2002 WL 32172302, at *4 (N.D. Iowa Feb. 6, 2002).

**III.    Summary Judgment Standard**

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate if the record shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  See Dulany v. Carnahan, 132 F.3d 1234, 1237 (8th Cir. 1997).  "The moving party bears the initial burden of identifying 'those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'"  Webb v. Lawrence County, 144 F.3d 1131, 1134 (8th Cir. 1998) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (other citations omitted)).  "Once the moving party has met this burden, the non-moving party cannot simply rest on mere denials or allegations in the pleadings; rather, the non-movant 'must set forth specific facts showing that there is a genuine issue for trial.'" Id. at 1135.  Although the facts are viewed in a light most favorable to the non-moving party, "in order to defeat a motion for summary judgment, the non-movant cannot simply create a factual dispute; rather, there must be a genuine dispute over those facts that could actually affect the outcome of the lawsuit." Id.

In addition, "[a]ll material facts set forth in the statement (of undisputed material facts) filed by the moving party...shall be deemed admitted unless controverted by the statement filed by the non-moving party . . . ."  Local Rule 56.1, Rules of the United States District Court for the Eastern and Western Districts of Arkansas.  Failure to properly support or address the moving party's assertion of fact can result in the fact considered as undisputed for purposes of the motion.  FED. R. CIV. P. 56(e).

**IV.    Discussion**

Only Plaintiff's First Amendment claims against Defendant Freyder remain pending.

### A. First Amendment

Inmates retain their First Amendment rights despite incarceration. Cruz v. Beto, 405 U.S. 319, 322 (1972). Limitations, however, may be placed on the exercise of those rights based on the needs of the penal system. Constitutional claims that would otherwise receive strict scrutiny analysis are evaluated under a lesser standard in the context of a prison setting. Turner v. Safley, 482 U.S. 78, 81 (1987). Under Turner, a prison regulation may restrict a prisoner's constitutional rights if it is "reasonably related to legitimate penological interests." Turner, 482 U.S. at 89.

Turner sets out four factors courts should consider when evaluating First Amendment claims: (1) whether there is a valid rational connection between the prison regulation and the government interest justifying it; (2) whether alternative means are available to the inmate to exercise the right; (3) whether an accommodation would have a significant ripple effect on guards, other inmates, and prison resources; and (4) whether there is an alternative that fully accommodates the prisoner at de minimis cost to valid penological interests. Id. at 89-91.

In analyzing a First Amendment free exercise claim, a court must "consider first the threshold issue of whether the challenged governmental action infringes upon a sincerely held religious belief and then apply the *Turner* factors to determine if the regulation restricting the religious practice is reasonably related to legitimate penological objectives." Gladson v. Iowa Dep't. of Corrections, 551 F.3d 825, 831 (8th Cir. 2009) (internal citation omitted).

### B. Qualified Immunity

Defendant Freyder asks the Court to dismiss Plaintiff's claims against him in his individual capacity based on qualified immunity. (Doc. No. 74 at 5). Qualified immunity shields a government official from liability when his conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald,

457 U.S. 800, 818 (1982). Qualified immunity is a question of law, not a question of fact. McClendon v. Story County Sheriff's Office, 403 F.3d 510, 515 (8th Cir. 2005). Thus, issues concerning qualified immunity are appropriately resolved on summary judgment. See Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (the privilege is "an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.").

To determine whether defendants are entitled to qualified immunity, courts generally consider two questions: (1) whether the facts alleged or shown, construed in the light most favorable to the plaintiff, establish a violation of a constitutional or statutory right; and (2) whether that right was so clearly established that a reasonable official would have known that his or her actions were unlawful. Pearson v. Callahan, 555 U.S. 223, 232 (2009).[3] "'A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" Thurmond v. Andrews, 972 F.3d 1007, 1012 (8th Cir. 2020) (internal citation omitted). In considering whether a right is clearly established, courts do not look at precedent "at a high level of generality." Id. Instead, courts "look for a controlling case or a robust consensus of cases of persuasive authority. There need not be a prior case directly on point, but 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Id. (internal citation omitted). A defendant is entitled to qualified immunity only if no reasonable fact finder could answer both questions—whether the facts alleged or shown, construed in the light most favorable to the plaintiff, establish a violation of a constitutional or statutory right and

---

[3] Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Nelson, 583 F.3d at 528 (quoting Pearson v. Callahan, 555 U.S. at 236).

whether that right was so clearly established that a reasonable official would have known that his or her actions were unlawful—in the affirmative. Nelson v. Correctional Medical Services, 583 F.3d 522, 528 (8th Cir. 2009).

### C. Uncontested Facts

As an initial matter, the Court notes that Plaintiff has not filed a response to Defendant Freyder's Motion. He has not controverted any material fact set forth by Defendant Freyder in his statement of undisputed material facts. Accordingly, all material facts submitted by Defendant Freyder (Doc. No. 73) are deemed admitted. Local Rule 56.1(c); FED. R. CIV. P. 56(e).

It is uncontested that Plaintiff is Muslim. (Doc. No. 73 at ¶ 3). It is further uncontested that Policy 545 set out the method and manner in which Jumu'ah prayer must be conducted. (Id. at ¶ 23). Pursuant to Policy 545, the Islamic Coordinator selects an inmate from each unit who is knowledgeable of the required components of Jumu'ah prayer and submits the name to the Warden of the Unit. (Id. at ¶ 24). This inmate is sometimes referred to as the "prayer leader." (Id. at ¶ 24). The prayer leader is responsible for leading the Jumu'ah prayer and reading passages of the Quran that had been selected by the Islamic Coordinator. (Id. at ¶ 25). The prayer leader does not, however, guide or teach the other inmates, the part of Jumu'ah known as the Khutbah. (Doc. No. 73 at ¶ 25; Doc. No. 69 at ¶ 2). Policy 545 expressly prohibits inmates from delivering the Khutbah. (Doc. No. 73 at ¶ 26). The Khutbah is provided by the Chaplain or a free world volunteer. (Doc. No. 73 at ¶ 27). If neither is available, the Khutbah is provided via a recording on a DVD. (Doc. No. 73 at ¶ 26).

On June 24, 2022, Defendant Freyder designated Plaintiff as the temporary inmate prayer leader, because Anthony King, who was designated in June as the prayer leader, was ill. (Doc. No. 72-2 at ¶¶ 23, 24). On or around July 18, 2022, Defendant Freyder removed Plaintiff as a

6

prayer leader because Plaintiff "was commenting about what he read from the holy Quran"; Plaintiff had delivered a Khutbah after reading the scripture. (Doc. No. 69 at ¶ 3; Doc. No. 76-1 at 1; Doc. No. 37-3 at 1).

### D. Analysis

Plaintiff made clear during his deposition that he is suing Defendant Freyder because Defendant Freyder does not allow him to perform the Khutbah. (Doc. No. 72-3 at 46:1-47:13). Plaintiff complains that Defendant Freyder is "blocking us from speaking about what we just read." (Id. at 46:18-46:19).

The constitutionality of religious policies and practices at the various units of the ADC, including issues related to Jumu'ah prayer, have been challenged in earlier cases in this Court. The more notable results of previous actions were summarized in a fairly recent case:

> [i]n a 1987 consent decree in *Blue v. Arkansas Board of Correction*, the Arkansas Department of Correction (ADC) agreed to hire a part-time Muslim chaplain to provide group Islamic services for Muslim inmates, to recruit and organize free world volunteers of NOI and AMM to provide additional services, and to voice Islamic concerns with the ADC chaplaincy program. No. 84-cv-551 (E.D. Ark. August 31, 1987). Other litigation resulted in an injunction requiring ADC to offer access to a pre-recorded Khutbah (sermon) when a live Khutbah was not available, and to allow Muslim inmates to read aloud from the Qur'an during Jumu'ah. *Shabazz v. Arkansas Dept. of Correction*, 5:03cv00409 (E.D. Ark. 2005), different issues aff'd, 268 Fed.Appx. 487 (8th Cir. 2008), and *Shabazz v. Norris*, 5:03cv00401, 2007 WL 2819517 (E.D. AR 2007).

Holt v. Kelley, No. 5:19CV00081-BSM-JTK, 2020 WL 6149686, at *2 (E.D. Ark. Aug. 17, 2020), report and recommendation adopted in part, rejected in part, No. 5:19-CV-00081-BSM, 2020 WL 5821958 (E.D. Ark. Sept. 30, 2020).

As further background, the prohibition against inmates delivering the Khutbah was not regularly enforced until March 2003. Shabazz v. Arkansas Dep't of Correction, et al., 5:03-cv-00409-JMM (E.D. Ark.) (Doc. No. 67).[4] As explained by the ADC's former Islamic Coordinator

---

[4] The Court may take judicial notice of these earlier proceedings because they are directly related to the issues here. Conforti v. United States, 74 F.3d 838, 840 (8th Cir. 1996).

7

Omar Almobarak during a 2004 hearing in connection with the plaintiff's Motion for Preliminary Injunction in Shabazz v. Arkansas Dep't of Corrdction, et al., 5:03-cv-00409-JMM (E.D. Ark.), "the ADC has had significant problems with the racial tension created by the Nation of Islam inmates." 5:03-cv-00409-JMM (Doc. No. 67 at 7). Allowing an inmate to give a Khutbah could create a problem "with inmates who sought merely to propagate their own racist agendas." (Id.). And despite whatever measures Mr. Almobarak could conceive to reduce the possibility of an inmate pursuing his own agenda, such as submitting a copy of the proposed Khutbah in advance, there was no way to avoid that the inmate could be perceived as a religious leader. (Id. at 8).

The District Court granted in part and denied in part the plaintiff's request for injunctive relief. The Court granted injunctive relief in that the ADC had to provide a recorded Khutbah for Jumu'ah when no approved person was able to perform the Khutbah live. The District Court, however, denied the plaintiff's request to deliver the kutbah himself. In arriving at its decision, the District Court reasoned that select inmates "should not be elevated in status and given moral authority over others," among other points. 5:03-cv-00409-JMM (Doc. No. 67 at 11).[5]

---

[5] See also Heikkila v. Kelley, No. 5:16CV00299-BSM/JTR, 2018 WL 4610141, at *13 (E.D. Ark. Aug. 27, 2018), report and recommendation adopted, No. 5:16-CV-00299 BSM, 2018 WL 4610625 (E.D. Ark. Sept. 25, 2018), aff'd as modified, 776 F. App'x 927 (8th Cir. 2019) (collecting cases) (*Kemp v. Liebel*, 877 F.3d 346, 353–54 (7th Cir. 2017) ("[O]ur precedent suggests that prison officials 'need not ... allow inmates to conduct their own religious services' so long as the delay in offering services by qualified leaders is reasonable."); *Baranowski v. Hart*, 486 F.3d 112, 120-21, 123-25 (5th Cir. 2007) (no First Amendment or RLUIPA violation from prison policy prohibiting Jewish inmates from holding religious services without assistance of a rabbi or approved outside volunteer); *Shabazz v. Arkansas Dept. of Corr.*, 157 Fed. Appx. 944, 945 (8th Cir. 2005) (recognizing that "prison security may be jeopardized if an inmate is put in a position of religious leadership over other inmates, or if an inmate has the opportunity to use religious services to engage in disruptive communications"); *Adkins v. Kaspar*, 393 F.3d 559, 564, 571 (5th Cir. 2004) (no First Amendment or RLUIPA violation where inmate-members of a religious group were not permitted to assemble on certain days "because no volunteer deemed acceptable by defendants was available to supervise the meetings," which was due to the "dearth of qualified outside volunteers," rather than a prison rule or regulation); *Spies v. Voinovich*, 173 F.3d 398, 405-06 (6th Cir. 1999) (no First Amendment violation because prison's "prohibition on

The plaintiff filed an interlocutory appeal challenging the District Court's decision; he argued that inmates should be permitted to perform the Khutbah. Shabazz v. Arkansas Dep't of Correction, 157 F. App'x 944 (8th Cir. 2005). The Court of Appeals for the Eighth Circuit found that the plaintiff failed to support his position, citing to Doyle v. Prewitt, 39 Fed. Appx. 344, 347 (7th Cir. Apr.22, 2002):

> the restriction at issue [in Doyle] was upheld upon recognition that prison security may be jeopardized if an inmate is put in a position of religious leadership over other inmates, or if an inmate has the opportunity to use religious services to engage in disruptive communications.

Id. at 946.

The Court of Appeals upheld the prohibition on inmates being allowed to perform the Khutbah. Id.

Back to the case at hand, Policy 545 includes the injunctive relief provided in the cases mentioned above. But the Policy prohibits inmates delivering the Khutbah.

Plaintiff raises here the same narrow issue that was litigated in Shabazz: Plaintiff complains that he is not allowed to deliver the Khutbah. Considering Shabazz v. Arkansas Dep't of Correction, 157 F. App'x 944 (8th Cir. 2005), which upheld the same restriction that Plaintiff challenges now, no reasonable jury could conclude that Defendant Freyder violated Plaintiff's

---

inmate-led groups necessarily exists to avoid the risks that would arise from unsupervised inmate activity and the creation of an alternate, inmate-led power structure and thus, clearly, has a valid rational connection to [the prison's] interest in maintaining prison security"); *Anderson v. Angelone*, 123 F.3d 1197, 1199 (9th Cir. 1997) ("Requiring an outside minister to lead religious activity among inmates undoubtedly contributes to prison security."); *Cooper v. Tard*, 855 F.2d 125, 129 (3d Cir. 1988) (recognizing that prison had a "legitimate governmental interest" in prohibiting inmates from conducting group religious services, under the leadership of an inmate they recognized as "the Imam," because "what plaintiffs did was establish a leadership structure within the prison alternative to that provided by the lawful authorities and contrary to the very purposes of the MCU," which "posed a potential threat to prison authority that caused reasonable concern among defendants")).

freedom to exercise his religion. Even if a violation occurred, again considering <u>Shabazz v. Arkansas Dep't of Correction</u>, 157 F. App'x 944, Defendant Freyder would be entitled to qualified immunity.

Plaintiff also alleges that Defendants violated his First Amendment right to freedom of speech by not allowing him to deliver the Khutbah. To the extent Plaintiff makes these allegations as isolated from his allegations involving religion, the <u>Turner</u> factors weigh against him. First, there is a rational connection between the policy of not allowing inmates to give the Khutbah. As recognized in <u>Shabazz</u>, doing so could place an inmate in a position of religious leadership. Second, there appears to be an alternative available to Plaintiff to exercise his right—a pre-recorded Khutbah—and there is no evidence that Plaintiff is prohibited from praying with others outside of Jumu'ah in circumstances where he would not be perceived as a religious leader. (Doc. No. 72-2 at ¶¶ 28, 29). If the right, however, is viewed strictly as the right to deliver the Khutbah, there is no alternative available. Third, an accommodation in the form an inmate delivering a pre-approved Khutbah, for example would likely have a ripple effect on other inmates (as Plaintiff could be viewed by some at least as a religious leader) and prison administration (as an inmate religious leader could detract from the authority of prison officials). These factors weigh heavily in favor of restricting inmates from delivering the Khutbah. As such, no jury could find that Defendant Freyder violated Plaintiff's First Amendment right to free speech. Even if there was a violation in these particular circumstances, qualified immunity would apply.

Additionally, Plaintiff challenged Defendant Freyder's practice of removing an inmate's name from the Jumu'ah list if the inmate missed Jumu'ah too often. Defendant Freyder admits inmates are removed from the Jumu'ah list after 3-to-four consecutive absences. (Doc. No. 69 at ¶ 8; Doc. No. 76 at ¶ 8). But Defendant Freyder also adds inmates back to the list upon request.

(Doc. No. 69 at ¶¶ 8, 9; Doc. No. 76 at ¶¶ 8, 9). Defendant Freyder's statement is consistent with the allegations in Plaintiff's Complaint. (Doc. No. 2 at 9). The requirement is reasonably related to penological interests. For example, inmates must "have already had a bath/shower the Friday prior to Jumu'ah (between midnight and noon, work schedule not withstanding." (Doc. No. 72-2 at 6). Having a list of inmates attending Jumu'ah aids in prison administration regarding days off/lay-in days and hygiene. Plaintiff has not come forth with any evidence as to how requesting to be added back to the list infringes on the practice of his religion. Plaintiff also has not alleged, much less established, that he was not added back to the list when he asked to be readded. All things considered, no reasonable jury could conclude that Defendant Freyder violated Plaintiff's right to free exercise by maintaining a list of inmates attending Jumu'ah, removing an inmate from the list after 3-to-four consecutive absences, and adding inmates back to the list upon request. Even if a violation occurred, Plaintiff has not come forward with clearly-established law, and the Court is not aware of any, that would have put Defendant Freyder on notice that his actions were unlawful.

The Court concluded that no reasonable jury could find that Defendant Freyder violated Plaintiff's First Amendment rights. The Court further concluded that even if a violation occurred, Defendant Freyder was entitled to qualified immunity. Based on that analysis, the Court recommends that Defendant Freyder's Motion be granted as to Plaintiff's First Amendment claims against him in his personal capacity. Because the Court found Defendant Freyder in his individual capacity did not violate Plaintiff's rights, Plaintiff's official capacity claims against Defendant Freyder also fail.

## V. CONCLUSION

IT IS THEREFORE ORDERED that:

1. Defendant Freyder's Motion for Summary Judgment (Doc. No. 72) be GRANTED.

2. Plaintiff's Motion for Summary Judgment (Doc. No. 68) be DENIED.

3. Plaintiff's claims against Defendant Freyder be DISMISSED with prejudice.

DATED this 16th day of November, 2023.

                                                                JEROME T. KEARNEY
                                                                UNITED STATES MAGISTRSTE JUDGE